AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>**BRANDON EJAE ELLIOT**<br><br>*Defendant(s)* | Case No.<br>5:24-mj-1267-PRL<br><br>**SEALED** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about _____December 3, 2022,_____ in the county of _____Sumter_____ in the _____Middle_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1111(a) | Second degree murder within the special maritime and territorial jurisdiction of the United States |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Christine Infantolino, FBI
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: _November 21, 2024_

_____
*Judge's signature*

City and state: _Ocala, Florida_

Philip R. Lammens, U.S. Magistrate Judge
*Printed name and title*

STATE OF FLORIDA     Case No. 5:24-mj-1267-PRL

COUNTY OF MARION

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Christine Infantolino, after being duly sworn, depose and state:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been so employed since September 2022. As an agent with the FBI, I am authorized to investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants. During my career as an FBI Special Agent, I have conducted multiple violent crime investigations involving interviews, arrests, and seized evidence. I have also participated in the execution of domestic terrorism arrests and child pornography search warrants.

2. Prior to being assigned to my duty office in Ocala, Florida, I completed nineteen weeks of FBI training during which I received instruction on various aspects of federal investigations. I am trained in investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. My education further includes a Master's degree in Investigations from the University of New Haven, and I am certified as a Basic Gang Specialist by the Florida Gang Investigators Association.

3. This affidavit is submitted in support of a criminal complaint affidavit charging Brandon Ejae ELLIOT with second degree murder in the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111(a). As set forth in more detail below, there is probable cause that on or about December 3, 2022, in Sumter County, Florida, ELLIOT murdered his federal prison cellmate.

4. I make this affidavit from personal knowledge based on my participation in this investigation, information from other criminal investigators, information from law enforcement officers, information from agency reports, and the review of documents provided to me by these witnesses and law enforcement officers. Because this affidavit is being submitted for the limited purpose of a criminal complaint, I have not set forth every fact learned during the course of this investigation.

## PROBABLE CAUSE

5. ELLIOT is a federal prison inmate who is currently serving a sentence for armed robbery. On December 3, 2022, ELLIOT was 32 years old. He was housed in the United States Penitentiary-II ("USP-II") in the Coleman Federal Correctional Complex ("FCC Coleman") in Sumter

County, Florida.  FCC Coleman is within both the Middle District of Florida and the special maritime and territorial jurisdiction of the United States.[1]

6.      On December 3, 2022, Federal Bureau of Prisons ("BOP") corrections officers in USP-II initiated a mandatory lockdown of ELLIOT's unit to conduct a head count of the inmates.  Beginning at approximately 9:30 A.M., ELLIOT and his 66-year-old cellmate, C.W.J., were locked inside cell number 219.

7.      Approximately an hour and a half later, around 11:06 A.M., corrections officers opened cell 219.  ELLIOT was standing at the cell door breathing heavily and appeared to be distressed.  The corrections officers then saw C.W.J. was lying down on the bottom bunk bed.  C.W.J. was unresponsive.  The corrections officers immediately notified the medical staff.  ELLIOT was restrained and removed from the cell.

---

[1] FCC Coleman is within the "special maritime and territorial jurisdiction of the United States," as defined by 18 U.S.C. § 7(3) because the property is subject to exclusive legislative jurisdiction.  The FCC Coleman property was obtained by the United States via condemnation in 1992.  The Governor of Florida executed a Deed of Cession pursuant to Section 6.04, Florida Statutes, on November 3, 1997, and the United States Attorney General accepted exclusive legislative jurisdiction over the property on February 13, 1998, in accordance with 40 U.S.C. § 3112.

8.     The corrections officers performed chest compressions until the Emergency Medical Services ("EMS") arrived and assumed the life-saving responsibilities. C.W.J. had multiple puncture wounds to his body. There appeared to be blood splattered on clothing and linens on the bottom bunk where C.J.W. was found.



*Tthe bottom bunk in cell 219 where C.W.J. was found unresponsive.*



*An image of clothing and linens on the bottom bunk where C.W.J. was found.*



*A close-up image of what appears to be blood splattered on clothing.*

5



*Another shirt on the bottom bunk where C.W.J. was found.*



*The shirt, unfolded, revealing blood splattered on it.*

9. The BOP's medical assessment reflected the following:

[C.J.W.] was unresponsive. No pulses were present. No vital signs obtained. CPR was started. AED was applied. Reported no shock needed. Continue CPR. CPR was continued. 911 call

6

was called by Lt. It was reported that [ELLIOT] stated that he was high. Narcan IM administered to right deltoid. With no effect. CPR continued until EMS arrived. EKG showed flat line. EMS continued CPR and he was transported by EMS to Leesburg Reginal Hospital . . .

10.     C.W.J.'s medical records from Leesburg Hospital showed that he "had a stab wound to the left thorax" and "when EMS arrived he was pulseless [and] unresponsive, ACL and CPR protocol were initiated." The hospital conducted an ultrasound of C.W.J.'s heart. The ultrasound showed "no cardiac movement after EMS had had 45 minutes of pulseless electrical activity [C.J.W.] had no spontaneous breaths no spontaneous neurologic symptoms." At 12:16 P.M., C.W.J. was pronounced dead, which is approximately an hour after he was found unresponsive in his cell.

11.     C.W.J.'s body was transported to the District 5 Medical Examiner's Office at 4:26 P.M. on December 3, 2022. On December 4, 2022, the Deputy Chief Medical Examiner conducted C.W.J.'s autopsy. The findings revealed a penetration stab wound on C.W.J.'s left chest, two penetration stab wounds on his abdomen, and two penetration stab wounds on his left arm. There were also seven superficial injuries on his right axilla, left upper chest, posterior right arm and left arm, posterior left forearm, and anterior left hip. The stab wound on C.W.J.'s chest involved his pericardial

7

sac and heart. The medical examiner ruled the cause of death as multiple stab wounds, and the manner of death was ruled as a homicide.

12. C.W.J.'s blood was analyzed postmortem, and the toxicology report revealed that the only substances in C.W.J.'s system were caffeine and the naloxone (Narcan) that was administered to him by BOP staff based on ELLIOT's claim that C.W.J. was "high" at the time of the incident.

13. ELLIOT also was evaluated by BOP medical staff. As noted above, he claimed that C.W.J. was "high" and came after him with a shank ( a sharpened piece of metal). ELLIOT had multiple long scratches on the right side of his body. The scratches started at his ribs and went toward his back. He had a long scratch on the left side of his abdomen, as well. ELLIOT was not bleeding from his scratches.



8







*Pictured above are four images reflecting the scratches on ELLIOT's torso.*

14.  ELLIOT also had scratches on his face and shoulders.



*Scratches on ELLIOT's left temple.*



*Scratches on ELLIOT's forehead.*



*A scratch on ELLIOT's right shoulder.*

11



*A scratch on ELLIOT's left shoulder.*

15. In my training and experience, the scratch wounds on ELLIOT's torso, shoulders, and face are consistent with defensive wounds inflicted by a person who was fighting off an aggressor. Scratches on an aggressor are considered defensive wounds because they are typically inflicted by the victim trying to defend themselves against the aggressor during an altercation, often by scratching exposed areas of the aggressor that are readily accessible to the victim of the attack, including the aggressor's face, neck, chest, and arms, while attempting to fight back or escape.

16. BOP's evidence response team searched cell 219 and found a metal object with a sharp, pointed end. The metal object was collected and placed into evidence.

12



*The sharp metal object by evidence marker #1.*



*A close-up image of the metal object.*

17. While the metal object did not appear to have any blood on it, the BOP staff also found a brown towel with what appeared to be blood. In my training and experience, the pattern of blood on the towel with its sharp

13

lines and angles is consistent with having used the towel to wipe the blood off an object.



*The brown towel found in cell 219.*

18.    On July 6, 2023, FBI special agents interviewed three inmates, D.B., S.A., and D.T., who were housed in adjacent cells to ELLIOT and C.W.J. at the time of the incident.

19.    D.B. advised that around 8:30 A.M. on the day of the incident, ELLIOT had pulled a knife on C.W.J. in the communal area of the K-Unit. About an hour later, D.B. heard a scuffle coming from ELLIOT's cell. He

14

advised that he heard hitting and C.W.J. saying, "Why?" D.B. heard ELLIOT say, "Motherfucker, I can't take it anymore!" C.W.J. cried, "Get away from me!"

20. S.A. advised that ELLIOT and C.W.J. fought about two or three times before C.W.J. died. ELLIOT and C.W.J. tried to switch cells so they would no longer be housed together. On the day of the incident, ELLIOT and C.W.J. argued a lot. During the prisoner head count, S.A. heard tussling and fighting coming from ELLIOT's cell.

21. D.T. advised that ELLIOT and C.W.J. were not getting along, and they had to be pulled apart from each other earlier that day. D.T. stated that he was asleep in his cell when he heard banging coming from ELLIOT's cell. The noise sounded like "everything in the cell was getting hit." ELLIOT then spoke into the vent between his cell and D.T.'s cell. ELLIOT said, "I killed him."

## CONCLUSION

22. Based on the evidence described above, there is probable cause that ELLIOT unlawfully killed a human being with malice aforethought in the special maritime and territorial jurisdiction to the United States, in violation of 18 U.S.C. § 1111(a).

This concludes my affidavit.

_____
Special Agent Christine Infantolino
Federal Bureau of Investigations

*Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone or other reliable electronic means consistent with Fed. R. Crim. P. 4.1 and 4(d) before me this* 21st *day of November 2024.*

_____
The Honorable Philip R. Lammens
United States Magistrate Judge